## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

VERONICA DRENNEN, et al.,

        Plaintiffs,

v.                                 CIVIL ACTION NO.  5:06-cv-00390

UNITED STATES OF AMERICA,

        Defendant.

### MEMORANDUM OPINION AND
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### I.  INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs bring this medical malpractice action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-80.  Plaintiffs' claims, which allege medical negligence under West Virginia's Medical Professional Liability Act (MPLA), W. Va. Code §§ 55-7B-1 *et seq.*, and loss of consortium, arise out of Plaintiff Veronica Drennen's treatment by Roy Wolfe, Jr., M.D., on October 21, 2003.  At all relevant times, Dr. Wolfe was employed by Community Health Systems, Inc. (CHSI), a federally-funded health care provider in Beckley, West Virginia.  By virtue of its federal funding, CHSI is an entity whose employees are deemed federal employees under 42 U.S.C. § 233.  Thus, this Court has jurisdiction pursuant to 28 U.S.C. § 1346(b)(1) and venue is proper under 28 U.S.C. § 1391(b)(2).  Plaintiffs seek damages for medical expenses, lost wages, non-economic damages including loss of consortium and other compensatory damages.

After exhausting their administrative remedies as required by 28 U.S.C. § 2401(b), Plaintiffs filed their Complaint in this Court on May 22, 2006.  The parties proceeded through discovery and on September 14, 2007, the Court entered a Memorandum Opinion and Order [Docket 103] denying Defendant's motion for summary judgment.  Pursuant to 28 U.S.C. § 2402, this matter was tried to the Court without a jury on September 18, 2007.  In accordance with Fed. R. Civ. P. 52(a)(1), the Court now makes its findings of fact and conclusions of law.

## II.  PRELIMINARY FINDINGS OF FACT AS TO MEDICAL HISTORY

1.      On December 18, 2001, Plaintiff Veronica Drennen underwent surgery at Raleigh General Hospital in Beckley, West Virginia to correct a pelvic organ prolapse, also known as a cystocele.[1] The surgery, performed by Dr. Wolfe, and Angel Rosa, M.D., consisted of five procedures:

1.      Total vaginal hysterectomy and bilateral salpingo-oopmorectomy.
2.      Culdoplasty.
3.      Sacrospinous ligament fixation.
4.      Pubic bone suburethral stabilization sling.
5.      Cystoscopy.

(Trial Ex. 1.) In his operative note, Dr. Wolfe described the procedure as follows:

> Cystoscopy was performed.  Indigo carmine had been given 5-10 minutes previously.  I viewed the urethra and the interior of the bladder and did not see any stitches or defects.  I saw blue dye exit from each ureteral orifice.  The cystoscope was removed . . . .

(Trial Ex. 1.) Mrs. Drennen did not complain of any post-operative pain or problems following her surgery on December 18, 2001.

2.      At her annual exam on August 20, 2003, Mrs. Drennen complained of a vaginal bulge at the perineum that caused her pain after a long day of standing.  She did not, however, report any urine

---

[1] A pelvic organ prolapse, or cystocele, is a medical condition that occurs when the fascia between the bladder and vagina is weak, allowing the bladder to bulge through the top of the vagina.

problems.  After examining Mrs. Drennen, Dr. Wolfe diagnosed the problem as an anterior defect consisting mostly of a paravaginal defect, with some central defect.

3.      On August 27, 2003, Mrs. Drennen saw Dr. Wolfe for the temporary placement of a pessary, which is designed to plug a vaginal defect and prevent further bulge.  Upon examination, however, Dr. Wolfe determined that the defect was an anterior one, which could be corrected by a vaginal, as opposed to a more intrusive abdominal, surgical approach.

4.      On October 21, 2003, Mrs. Drennen underwent an anterior colporrhaphy[2] at Raleigh General Hospital to correct the symptomatic cystocele, or bladder prolapse.  During surgery, Dr. Wolfe did not perform any type of intraoperative investigation, such as cystoscopy, to determine whether he had caused damage to the bladder or ureters.  Mrs. Drennen was discharged the following day, on October 22, 2003.

5.      On October 27, 2003, Mrs. Drennen called Dr. Wolfe's office complaining of "a lot" of pain, and asking that her prescription of Tylox, her pain medication, be refilled.

6.      Mrs. Drennen telephoned Dr. Wolfe's office again on November 4, 2003, reporting pain on her left side.  Dr. Wolfe ordered a renal ultrasound for the next morning, November 5, 2003.

7.      After the ultrasound, Mrs. Drennen met with Dr. Wolfe to discuss the results.  The ultrasound report described "gross left hydronephrosis," or swelling of the kidney due to fluid retention.  The report also identified the presence of paracolic fluid around the kidney, indicating that the kidney was obstructed.  Based on this report, Dr. Wolfe referred Mrs. Drennen to a urologist.

---

[2] An anterior colporrhaphy is a surgical procedure designed to return a bulging bladder to its correct anatomical position.  The surgeon makes an incision into the anterior (top) of the vaginal wall to access the weakened or separated fascia, which is imprecated together from the sides and then sutured to provide support so that the bladder no longer bulges into the vagina.

8.      The urologist, Apolonio Lirio Jr., M.D., saw Mrs. Drennen that same day.  After performing

several tests, Dr. Lirio found an obstruction in the left ureter.  He noted in his operative report:

> Cystoscopy was carried out and the anterior urethra is open.  Bladder
> has moderate capacity.  There is significant edema at the trigonal
> area.  The mucosa is significantly swollen and elevated.  After
> sometime, I was able to identify the right ureteral orifice and right
> retrograde pyelogram was done.  This showed no ureteral obstruction
> on the right side.  Ureteroscope was inserted into the right ureteral
> orifice and examination of the intramural ureter and distal ureter was
> done and showed no evidence of any obstruction or any problem.
> Ureteroscope was withdrawn.  Left ureteral orifice was identified.  It
> was laterally deviated.  I could see the intramural ureter which is
> medially deviated.  An 8 cone tip ureteral catheter was inserted into
> the left ureteral orifice.  Attempted left retrograde pyelogram failed.
> Dye just cannot be injected.  So Access catheter was inserted through
> the left ureteral orifice.  Several attempts were made to pass a 0.035
> guide wire.  I was able to pass it for a short distance, may be 3-4 cm.
> After this, the ureteroscope was passed over the guide wire and
> attempt was made to pass the ureteroscope but could not pass beyond
> 2 cm from the left ureteral orifice, very tight.  After this, attempt was
> made to pass double J stent over the guide wire using a 4.8 24 cm
> double J stent but just could not pass beyond 2 cm from the left
> ureteral orifice.  A 4 cm Uromax balloon dilator was inserted over the
> guide wire but still could not pass beyond 2 cm from the left ureteral
> orifice.  This was pulled out and the guide wire was pulled out.  I feel
> at this point that any further attempt might just cause more damage
> to the left ureteral orifice, so the procedure was terminated.  The
> patient was taken to the recovery room in satisfactory condition.  At
> the patient's request, her condition was discussed with the family.  I
> discussed this with her husband as well as 3 other members of the
> family.  I told them it probably would be best to transfer the patient
> to Morgantown.

(Trial Ex. 8a.)

9.      Mrs. Drennen was admitted to Raleigh General Hospital that night and transported to West

Virginia University Hospital (WVUH) by ambulance the next day, where she was seen by a

urologist, Stanley Zaslau, M.D., regarding the blockage in her ureter.

4

10.     On December 6, 2003, Dr. Zaslau attempted to place a left nephroureteral stent through the ureter and down to the bladder.  When the stent could not be placed past the obstruction, Dr. Zaslau placed a percutaneous nephrostomy tube in her kidney to drain the excess liquid.

11.     Mrs. Drennen was discharged on November 10, 2003, with the nephrostomy tube still in place.  The tube was attached to an external urine collection bag, which Mrs. Drennen had to empty twice a day.

12.     Mrs. Drennen returned to WVUH on November 24, 2003, for a follow-up with Dr. Zaslau. On that date, Dr. Zaslau wrote in a progress note:

> SUBJECTIVE:  We had the pleasure of seeing Veronica Drennen back.  She is a 55-year-old female status post urethral sling and cystocele repair with a left-sided ureteral obstruction post operatively.  She has a left-sided percutaneous nephrostomy that is draining out the kidney very nicely.  She has no pain and is comfortable.
>
> OBJECTIVE :  The abdomen is soft and nontender.  There is no CVA tenderness.
>
> PLAN:  The plan will be cystoscopy, retrograde pyelography and an attempt at a left double-J stent.  If this can be successfully performed, then we may not need to do a ureteral reimplant on her.  I think it is a worthwhile opportunity because she does have a percutaneous nephrostomy tube in place.  Should we be unable to do a cystoscopy and stent placement on her, we will schedule her for an open ureteral reimplantation.  She understands and she signed an informed consent.

(Trial Ex. 14.)

13.     On December 9, 2003, Mrs. Drennen again returned to WVUH for treatment by Dr. Zaslau. Dr. Zaslau was to perform three procedures: 1) cystoscopy; 2) left ureteroscopy; 3) left retrograde pyelogram.  He described his operative findings as follows:

> Cystoscopy shows the left ureteral orifice visualized.  After placing a sensor wire into the ureteral orifice, the ureter is found to travel

5

> medially.  Multiple attempts were made to pass the sensor and
> Pollack catheter past the level of obstruction without success.  Left
> ureteroscopy is performed and the ureter is noted to curve to the left
> shortly after entering the bladder.  Fluoroscopy shows that the left
> ureter is pulled medially.  There was some small amount of contrast
> expressed to the left ureteral orifice when injected to the
> percutaneous nephrostomy tube.

(Trial Ex. 15.)  Based on his observations during the cystoscopy, Dr. Zaslau determined that Mrs.

Drennen required left ureteral re-implantation surgery to bypass the blockage.

14.    Mrs. Drennen returned to WVUH for a fourth time on January 20, 2004, for the re-

implantation surgery.  During this surgery, Dr. Zaslau cut the ureter close to the obstructed trigone

area and reinserted it into the bladder, thereby bypassing the obstruction.  To facilitate recovery, Dr.

Zaslau also inserted a ureteral stent and a vaginal Foley catheter to help empty the bladder.  The

catheter was removed on February 2, 2004, and the stent was removed on March 2, 2004.

15.    Mrs. Drennen returned for a follow-up visit on May 3, 2004, at which time it was reported

that her urine was flowing properly and that she had "no pain and no complaints."  (Tr. Ex. 20.)

Mrs. Drennen returned for follow-up appointments on November 15, 2004, November 21, 2005,

March 6, 2006, and in March 2007.  Barring further complications, Mrs. Drennen needs to return

for follow-up appointments only on a yearly basis.

### III.  GENERAL CONCLUSIONS OF LAW

16.    The FTCA renders the Government liable for the negligent acts of its employees committed

"while acting within the scope of [their] employment, under circumstances where the United States,

if a private person, would be liable to the claimant in accordance with the law of the place where the

act or omission occurred."  28 U.S.C. § 1346(b)(1).  Thus, because Plaintiffs allege that the

purported negligence occurred in West Virginia, the Court is bound to apply West Virginia's

6

substantive law, which, in cases such as this one involving medical negligence, is the MPLA.  *See, e.g.*, *Osborne v. United States*, 166 F. Supp. 2d 479 (S.D. W. Va. 2001) (Haden, C.J.) (applying MPLA); *Bellomy v. United States*, 888 F. Supp. 760 (S.D. W. Va. 1995) (Haden, C.J.) (same).

17.    The MPLA sets forth the elements of a medical negligence claim as follows:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

> (2) Such failure was a proximate cause of the injury or death.

W. Va. Code § 55-7-3(a)(1)-(2).

18.    Thus, to prevail on a claim under the MPLA, the burden is on the plaintiff to prove, by a preponderance of the evidence, that the defendant was negligent and that the negligence was a proximate cause of the plaintiff's injury.  *Sexton v. Greico*, 216 W. Va. 714, 716, 613 S.E.2d 81, 83 (2005) (per curiam) (quoting syl. pt. 2, *Walton v. Given*, 158 W. Va. 897, 215 S.E.2d 647 (1975)).

19.    A plaintiff is generally required to establish the applicable standard of care and breach thereof by use of expert testimony.  W. Va. Code § 55-7B-7; *Bellomy*, 888 F. Supp. at 764; *but see Lutz v. Estate of Hillier*, 574 F. Supp. 1032, 1034 (S.D. W. Va. 1983) (Haden, C.J.) (allowing plaintiff to establish claim by calling defendant's experts as adverse witnesses and introducing their deposition testimony into the record).  "Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine."  *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997).  The Court is not required to accept as true, and may afford proper weight to, expert testimony that is internally inconsistent or contradictory. *Holm v. United States*, 325 F.2d 44, 46 (9th Cir. 1963); *cf. Jones v. Heckler*, 614 F. Supp. 277, 280

(D. Vt. 1985) (disregarding medical expert's testimony as not probative of plaintiff's medical condition because testimony was internally inconsistent).

20.    West Virginia has abolished the "locality rule," meaning that the standard of medical care is a national one.  Syl. pt. 1, *Plaintiff v. City of Parkersburg*, 176 W. Va. 469, 345 S.E.2d 564 (1986).

## IV.  FINDINGS OF FACT AS TO EXPERT TESTIMONY

### A.    Plaintiffs' Expert Testimony

21.    Plaintiff Veronica Drennen's treating physician and expert witness, Dr. Zaslau, is a board certified urologist who is the program director of the Urology Resident Program at West Virginia University's School of Medicine in Morgantown, West Virginia.

22.    At trial, Dr. Zaslau testified that he performs an average of one to two anterior colporrhaphy procedures each month, amounting to eighty five such procedures as of the time of trial.

23.    Dr. Zaslau proffered two theories of negligence:[3] 1) Dr. Wolfe negligently placed a stitch that blocked Mrs. Drennen's left ureter; and 2) Dr. Wolfe negligently failed to intraoperatively check the patency of the ureters.

### 1.    Negligent Stitch

---

[3]  At least once, Dr. Zaslau essentially merges the two theories:

> Q.    "Let me stop you right there.  If you're training a resident and the resident has involved the ureter in some fashion as you have described, are you going to say, 'Doctor, that was negligent to do that,' or is it the [sic] negligence in failing to check to make sure that you did not do it?" . . .

> A.    "The negligence is in failing to check and failing – and in failing to check, not doing something to solve the problem at that time by removing the stitch."

(Trial Tr. 155:10-20, Sept. 18, 2007.)

8

24.     Dr. Zaslau testified that there are four possible causes of a ureteral obstruction such as the one suffered by Mrs. Drennen: 1) surgical stitch; 2) kidney stone; 3) edema (swelling); or 4) chronic stricture (obstruction).

25.     Dr. Zaslau observed that Dr. Lirio's report of his examination of Mrs. Drennen on November 5, 2003 ruled out the possibility of a kidney stone.

26.     Dr. Zaslau ruled out edema because swelling is usually a temporary occurrence that would have subsided and relieved the obstruction between Dr. Lirio's examination of Mrs. Drennen on November 5, 2003, and Dr. Zaslau's examination on December 9, 2003.

27.     Dr. Zaslau also ruled out chronic stricture because Mrs. Drennen's medical records do not indicate any type of persisting problem, such as kidney decomposition or changes in the renal parenchyma.

28.     Dr. Zaslau thus determined that the only reasonable explanation for the obstruction in Mrs. Drennen's case is a stitch placed through the ureter by Dr. Wolfe during the anterior colporrhaphy.[4] Although he admits that he never actually saw a stitch, he testified that injuring a ureter is a known

---

[4] Dr. Zaslau did not mention any problems with Dr. Wolfe's procedure until a progress note written on November 15, 2004, after he had been retained by Plaintiffs, wherein he described the colporrhaphy as a "surgical misadventure." (Trial Ex. 21.)  However, Dr. Zaslau testified at trial that the cophorrhaphy was properly performed:

> Q.     "Now, does [the comment in your operative note] mean or even infer that [Dr. Wolfe's] prior procedure was improperly performed?" . . .

> A.     "Absolutely not.  The prior procedure was properly performed in terms of the surgical approach as described in the operative note."

(Trial Tr. 151:13-18.)

complication of an anterior colporrhaphy due to the ureter's proximity to the surgical field during the procedure.

29.     Based on his analysis, Dr. Zaslau concluded that the cause of the obstruction in Mrs. Drennen's ureter was a stitch placed through it by Dr. Wolfe during the colporrhaphy, and that the placing of the stitch violated the standard of care for surgeons performing such a procedure.

2.     *Failure to Check*

30.     Dr. Zaslau testified that there are multiple ways to check intraoperatively for any obstruction in or damage to the ureters, including cystoscopy and an intravenous pyelogram (IVP).[5] Dr. Zaslau expressly admitted at trial[6] that there is no national standard of care requiring cystoscopy during an anterior colporrhaphy:

> Q.     "[Does WVUH] have any standard of care in a policy or procedure that's written saying when you do this, you must do this; if you do an anterior repair, you must use cystoscopy?"
> . . .
> A.     "No, there is no, quote, standard of care from the hospital, nor is there, quote, standard of care in any of the recognized text on the urology or the gynecology side. . . ."

(Trial Tr. 158:24-159:14.)

---

[5] An IVP is a radiological procedure that consists of injecting the patient with radiopaque dye which is collected by the kidneys and then excreted by the kidneys into the ureters.  (Trial Tr. 248:22; 257:16-19.)  The patient is then x-rayed and the results of the IVP are read by a radiologist to "examine the urological status of the patient[.]"  (*Id.* at 257:18.)

[6] The Court had previously ruled in its Memorandum Opinion and Order [Docket 103] denying Defendant's motion for summary judgment that Dr. Zaslau would not be permitted to advance his opinion at trial that cystoscopy is part of the standard of care because of his admission that it was *his* standard, not a national standard.  (Docket 103 at 6 n.5.)

10

31.     Dr. Zaslau also rendered testimony indicating that it is possible to examine the patency of the ureters using blue dye.  On cross examination, however, he admitted that the dye test is only viable when coupled with cystoscopy:

> Q.     "There's no disagreement that Dr. Wolfe did not do a cystoscopy.  Is there any other procedure that he could have done to try and determine if there was a blockage to the ureters after his anterior colporrhaphy?"
>
> A.     "He could have injected some dye or had the anesthesia physician inject some dye and then look with the cystoscope to see if dye extruded from the ureters.  If he had simply given the dye and not looked, you could see it coming through into the urinary catheter, but you wouldn't know which side it was.  So really the best way to do this is to look."
>
> Q.     . . . "With a cystoscope?"
>
> A.     "Yes, with a cystoscope."
>
> Q.     And the reason you want to look with the cystoscope is if you simply inject the dye only – without a cystoscope, you're just going to see it come through the catheter into the urine bag at the bedside.  Is that a fair statement?
>
> A.     Yes.
>
> Q.     And you won't know if it's [the] left side or right side that has been impacted adversely by the operation?
>
> A.     That's correct.
>
> Q.     So in reality, when you are using the blue dye you're using the cystoscopy as well, aren't you?
>
> A.     Yes.

(Trial Tr. 156:24-157:24.)

>     B.     *Defendant's Expert Testimony*

11

32.     Defendant retained Dr. Wolfe, who was Mrs. Drennen's treating physician and testified at trial, and Karen Ashby, M.D., whose testimony was presented via deposition transcript.

### 1.     Dr. Ashby

33.     Dr. Ashby is a board certified obstetrician and gynecologist who practices at Case Western Reserve University in Cleveland, Ohio, and is an examiner for the American College of Obstetrics and Gynecology, which board certifies physicians.

34.     Dr. Ashby has performed approximately forty anterior colporrhaphies during her seventeen year career, the most recent of which took place over a year prior to trial.  She is admittedly not an expert in female urology, as she concentrates her practice on young women who are less likely to require anterior colporrhaphies.

35.     The gist of Dr. Ashby's deposition testimony is that there is no national standard of care requiring intraoperative cystoscopy during an anterior colporrhaphy.

### 2.     Dr. Wolfe

36.     Plaintiffs also called Mrs. Drennen's treating physician, Dr. Wolfe, who testified that there is no national standard of care requiring intraoperative cystoscopy during an anterior colporrhaphy.

37.     Dr. Wolfe also testified that cystoscopy would likely not have revealed the blockage in this case because Mrs. Drennen did not report any acute distress, which would likely have resulted from complete blockage.  Moreover, Dr. Wolfe noted that Dr. Zaslau had observed some dye coming through the left ureter during his tests, indicating that the blockage was not complete, making any type of intraoperative check by Dr. Wolfe futile.

38.     Finally, Dr. Wolfe opined that it is not the standard of care to do an IVP after an anterior colporrhaphy:

Q.      To your understanding, is it standard care to do IVPs after –

A.      No, no one does routine IVPs after an anterior repair.

(Trial Tr. 258:3-5.)  Dr. Zaslau never disputed this testimony.

### V.  FINDINGS OF FACT WITH REGARD TO LIABILITY

39.    The Court will address each of Plaintiffs' theories in turn.

### A.    Negligent Stitch

40.    First, it is not entirely clear that placing a stitch through the ureter during an anterior colporrhaphy is a breach of the standard of care.  Dr. Zaslau's opinion on this matter is undermined by his self-contradictory testimony at trial.  Dr. Zaslau testified on direct that "people don't go into [an anterior colporrhaphy] expecting to have a ureteral injury."  (Trial Tr. 84:16-17.)  On cross, however, he conceded that "[t]he [colporrhaphy] was properly performed," (*id.* at 151:17-18), and opined that "[t]he negligence is in failing to check."  (*Id.* at 155:19.)  Dr. Zaslau also admitted on cross examination that he himself had at least once placed a stitch through a ureter during an anterior colporrhaphy.  When asked whether he considered that stitch negligent, he answered, "No, because it was identified intraoperatively."  (*Id.* at 156:15.)  Based on this internally inconsistent and contradictory testimony, Plaintiffs have not carried their burden on this issue by a preponderance of the evidence.  Accordingly, the Court finds that placing a stitch through the ureter during an anterior colporrhaphy has not been proven to be a breach of the standard of care.

41.    Nevertheless, even if involving a ureter with a stitch was negligent, Plaintiffs have not met their burden of proving causation.  At trial, Dr. Zaslau testified that of the four possible causes of Mrs. Drennen's ureteral obstruction, surgical stitch, kidney stone, edema, or chronic stricture, he

ruled out all but surgical stitch.  Dr. Zaslau's conclusion was a logical one based on the process of elimination, rather than *res ipsa loquitur*, as Defendant suggests.[7]

42.    Even this deductive reasoning, however, does not tip the scales in Plaintiffs' favor. Plaintiffs' evidence is circumstantial at best.  By Dr. Zaslau's own admission, he never saw a stitch. The only evidence Plaintiffs rely on, then, is Dr. Zaslau's conclusion reached by process of elimination.  That process, however, is undermined by Dr. Lirio's report of significant edema, or swelling, near Mrs. Drennen's bladder and observation during his examination on November 5, 2003 that the ureter was laterally deviated.  Dr. Zaslau's conclusion also fails to account for Dr. Stoltzfus's observation that Mrs. Drennen's left ureter inserted ectopically, or in the wrong place. (Trial ex. 24.)  Thus, Dr. Zaslau did not eliminate all other reasonable explanations for the blockage, and his conclusion is weakened accordingly.

---

[7]  Defendant in its brief contends that this conclusion relies on the doctrine of *res ipsa loquitur*, and argues that the Court should disregard Dr. Zaslau's conclusion because the doctrine may not be applied in this case.  (Docket 120 at 11-12.)  In West Virginia, *res ipsa loquitur* allows the finder of fact to infer that a plaintiff's injury was caused by the defendant's negligence when

> (a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

Syl. pt. 1, *Foster v. City of Keyser*, 202 W. Va. 1, 501 S.E.2d 165 (1997).  Although Defendant is correct that the doctrine is inapplicable here, Plaintiffs are not attempting to invoke it.  It is evident from the possible causes of blockage ruled out by Dr. Zaslau that ureteral obstruction is just as likely to occur without negligence as it is to occur as the result of negligence.  Moreover, the Court is not convinced that these other possible causes have been sufficiently ruled out by the evidence.  For example, Dr. Stoltzfus, an interventional radiologist at WVUH, found that Mrs. Drennen's ureter inserted ectopically, or in the wrong place, which may cause blockage.  Also, Dr. Lirio's report on November 3, 2003, noted that he found significant edema bilaterally in Mrs. Drennen's bladder. Thus, *res ipsa* is not appropriate method of proof in this case.

43.     Dr. Zaslau's testimony is also weakened by the timing of his identification of a negligent stitch as the culprit in this case, which occurred only shortly after he was retained by Plaintiffs as an expert witness.  (*See* Trial Tr. 147-154.)  Prior to his work as an expert witness, Dr. Zaslau noted that Mrs. Drennen had "a history of cystocele repair . . . followed by obstruction of the left ureteral orifice," (Trial ex. 16), and "a difficult hysterectomy, [that required] a ureteroneocystostomy," (Trial ex. 20), however, in his first progress note after being retained, he described her reimplantation surgery as "secondary to a surgical misadventure."  (Trial ex. 21.)  Although experts are permitted to change their opinion throughout the course of discovery, Dr. Zaslau's opinion on causation changed at nearly the exact time he was retained.  While this coincidence does not entirely undermine his credibility, it does cast a shadow of doubt on the objectivity of his reports.

44.     Based on the foregoing, the Court is not convinced by a preponderance of the evidence that Dr. Wolfe caused Mrs. Drennen's injury by negligently involving her ureter with a stitch.

        B.      *Failure to Check*

45.     Plaintiffs' second theory of liability is that Dr. Wolfe was negligent in failing to intraoperatively check the patency of the ureters.  In their brief, Plaintiffs submit that there are two ways to check:[8] cystoscopy and IVP.  Plaintiffs also concede that cystoscopy is not the national standard of care, as the Court noted in its Memorandum Opinion and Order denying Defendant's motion for summary judgment, (Docket 103), wherein the Court stated, "Dr. Zaslau's opinion that cystoscopy is part of the standard of care for anterior repair surgery is undermined by his admission

---

[8]  Plaintiffs do not advance the argument that there is a third manner of checking by using a blue dye.  To the extent that Dr. Zaslau testified about that method at trial, he admitted that "when you are using the blue dye you're using the cystoscopy as well," (Trial Tr. 157:22-24), and that "the cystoscopy itself makes the . . . blue dye meaningful[.]" (Trial Tr. 220:10-12.)  Thus, using blue dye is merely a supplement to cystoscopy; it does not present an alternative method of checking.

that this is *his* standard, and not a national standard.  Accordingly, this particular opinion will not

be allowed at trial."  (*Id.* at 6 n.5) (emphasis in original).  Thus, the only remaining option is IVP.

46.     Defendant asserts in its brief that the Court may not consider the IVP theory because

Plaintiffs did not present it as an alternative until trial.  Under the FTCA, plaintiffs filing an

administrative claim are required only to "notif[y] the agency of the facts of the incident;" plaintiffs

"need not elaborate all possible causes of action or theories of liability."  *Barnson v. United States*,

531 F. Supp. 614, 623 (D. Utah 1982); *cf. Ahmed v. United States*, 30 F.3d 514, 517 (4th Cir. 1994)

(requiring only notice "sufficient to enable the agency to investigate" and a sum certain value).

47.     The MPLA, however, requires a plaintiff, within thirty days before filing a medical

malpractice lawsuit, to serve certain documents on heath care providers who will be joined as

defendants.  W. Va. Code § 55-7B-6(b).  Among those documents are a notice of claim and

screening certificate of merit that includes "a statement of the theory or theories of liability upon

which a cause of action may be based."  *Id.*  Without such notice, claims under the MPLA cannot

proceed and are subject to dismissal.  *See Stanley v. United States*, 321 F. Supp. 2d 805 (N.D. W.

Va. 2004).  "Although [the MPLA] is more demanding tha[n] [the FTCA] and its implementing

regulations, there is nothing to prevent a plaintiff from complying with both requirements."  *Id.* at

808-09.

48.     There is no dispute that Plaintiffs complied with the directives of both the FTCA and the

MPLA regarding the cystoscopy theory.  The IVP theory, however, was not mentioned in Plaintiffs'

administrative claim, (Trial Ex. 27 at 1), screening certificate of merit, (Trial Ex. 27 at 4-5), or

complaint.  (Docket 1 ¶ 13.)  While the FTCA's general notice requirement was satisfied by

Plaintiffs' administrative claim, their failure to notify Defendant of the IVP theory is problematic

under the MPLA.  In some circumstances, such as those where a plaintiff relies on a single theory that is not disclosed before the case is filed, this failure could result in the dismissal of the case. Here, because the lack of notice frustrates the legislative intent of both the FTCA[9] and the MPLA,[10] the Court will not consider the IVP theory of liability as a basis for negligence.

49.     Even if Plaintiffs had complied with the notice requirements of both statutes, the testimony elicited at trial does not establish IVP as the national standard of care.  Nowhere in his testimony does Dr. Zaslau opine that the national standard of care requires an IVP, only that "[t]o do neither [cystoscopy nor use intravenous dye] is a breach of the standard of care[.]" (Trial Tr. 132:22-23.) It is clear from his later testimony, however, that the intravenous dye mentioned here is the blue dye used in conjunction with cystoscopy; he is not referring to IVP.[11]  Regardless, any testimony that

---

[9]   The FTCA notice requirement "seeks to minimize costs by resolving claims through the administrative process." *Stanley*, 321 F. Supp. 2d at 809.  Thus, although their administrative claim satisfied the technical requirements of the FTCA, Plaintiffs may have saved Defendant time and expense had they advanced this theory from the beginning.

[10]  The MPLA notice requirement is "generally directed at limiting frivolous lawsuits." *Stanley*, 321 F. Supp. 2d at 809.  Although the case as a whole is not frivolous, the lack of any testimony at trial establishing IVP as the national standard of care indicates that this particular theory would not have survived the screening stage.

[11]  On cross examination, Dr. Zaslau testified:

> Q.     We've talked in this case about the two different ways that
>        you can check the patency of the ureter?
>
> A.     Yes.
>
> Q.     One being cystoscopy, the other being blue dye?
>
> A.     Yes.
>
> ...

(continued...)

17

the national standard of care requires IVP is contradicted by Dr. Wolfe, who testified that "no one does routine IVPs after an anterior repair." (Trial Tr. 258:5.) Thus, the Court finds that even if it were to consider IVP, the national standard of care does not require a routine IVP when performing an anterior colporrhaphy. Because Plaintiffs did not prove by a preponderance of the evidence that either IVP or cystoscopy is required, it is not a breach of the standard of care for a physician to fail to perform an intraoperative check during an anterior colporrhaphy.[12]

50.     In summary, having read Dr. Zaslau's deposition and then heard his testimony at trial, it is clear that he truly believes that cystoscopy should have been performed, and in his mind, should be standard practice. However, his own testimony forced the Court to exclude that opinion.

51.     That decision left him only with the negligent stitch and generalized failure to check theories, both of which he undermined with his fidelity to cystoscopy. He tried to say that a stitch in the ureter was a deviation, but then said that it was only negligent in the absence of cystoscopy. Dr.

---

[11](...continued)
> Q.     [I]n reality, when you are using the blue dye you're using the cystoscopy as well, aren't you?
>
> A.     Yes
>
> ...
>
> Q.     So there is really only one good way to check, and that's using cystoscopy; is that a fair statement?
>
> A.     Yes, it is.

(Trial Tr. 156:16-158:5.)

[12]  Having developed a little familiarity with the medicine in this case, it would appear that, given the low risk and relatively small expense, perhaps intraoperative cystoscopy *should* be the national standard of care in this procedure. Indeed, that appears to be under discussion. (*See* Trial Tr. 159:11-162:17.) However, unfortunately for Plaintiffs, it is not yet the national standard.

Zaslau then tried to lay aside cystoscopy itself and opine that it was negligent to fail to check *somehow*. However, the only two methods, it turns out, are the forbidden cystoscopy theory, and IVP, which no one has advocated is the standard of care.

### VI.  FINAL CONCLUSIONS OF LAW

52.    Plaintiffs have not proven, by a preponderance of the evidence, that Dr. Wolfe placed a stitch through Mrs. Drennen's ureter when performing the anterior colporrhaphy, or that if he did, it was a breach of the standard of care. Thus, the Court **FINDS** that Dr. Wolfe did not deviate from the applicable standard of care in that regard.

53.    Plaintiffs have not proven, by a preponderance of the evidence, that the national standard of care requires a surgeon to perform any kind of intraoperative check, such as intraoperative cystoscopy or IVP, during a routine anterior colporrhaphy. Thus, the Court **FINDS** that Dr. Wolfe did not deviate from the applicable standard of care by failing to intraoperatively check the patency of the ureters when he performed the anterior colporrhaphy on Mrs. Drennen.

54.    Accordingly, the Court **FINDS** that Defendant is not liable to Plaintiffs for medical negligence. Judgment will be entered for Defendant and the case will be removed from the Court's docket. A separate Judgment Order will enter this day implementing the rulings contained herein.

ENTER:        March 20, 2008

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE